# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Michael Calvin Francis,

          Petitioner,

v.

Joan Fabian,

          Respondent.

Civil No. 08-836 (DWF/AJB)


**REPORT AND RECOMMENDATION**

---

ARTHUR J. BOYLAN, United States Magistrate Judge

The above-captioned case is before the undersigned United States Magistrate Judge on Petitioner's application for habeas corpus relief under 28 U.S.C. § 2254 (Doc. No. 1). Petitioner Michael Calvin Francis appears <u>pro se</u>. Respondent appears by Michael Richardson, Assistant Hennepin County Attorney. The matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Minnesota Local Rule 72.1. For the reasons discussed below, the Court recommends that Petitioner's application for habeas corpus relief be denied and dismissed with prejudice.

## I.     BACKGROUND

After a jury trial, Petitioner Michael Calvin Francis was convicted of first degree murder, and attempted first degree murder on November 1, 2004. (Petition ¶¶ 2, 4, Docket No. 1.) Petitioner was sentenced to 180 months consecutive with a life term, and is currently incarcerated in the Minnesota Correctional Facility in Stillwater. (<u>Id.</u>, ¶ 3.) Petitioner filed a petition for post-conviction relief. (<u>Petition for Post-Conviction Relief</u>, Appendix, Exhibit F, Docket No. 17.) The post-conviction court held that Petitioner received effective representation

throughout trial; the prosecutor did not engage in misconduct; the trial court did not err in

refusing to give the lesser-included instruction requested by the Petitioner; the decisions of the

trial judge relating to evidence and testimony allowed at trial did not amount to an abuse of

discretion; the instructions given to the jury were proper; and Petitioner's challenges to the make

up of the jury pool were unfounded.  (Order Denying Petitioner's Motion for Post-Conviction

Relief, Appendix, Exhibit D, Docket No. 17.)

Petitioner consolidated his post-conviction appeal and direct appeals before the

Minnesota Supreme Court.  Francis v. State, 729 N.W.2d 584, 589, n.1 (Minn. 2007). The

following facts were recited by the Minnesota Supreme Court.

> On May 24, 2004, at approximately 10:50 p.m., Marvin Pate and
> his girlfriend, Pamela Ragland, were sitting in Ragland's car which
> had been parked on the east side of the 3300 block of Portland
> Avenue, a one way southbound street in South Minneapolis.  Pate
> got out of the car and was standing by the open front passenger
> door, talking to Ragland, who was in the driver's seat.  He noticed
> a blue Chevrolet Tahoe approach from the north and watched as it
> stopped in front of him.  He looked at the Tahoe, trying to see who
> was driving, and saw Francis in the driver's seat.  Pate then saw
> Francis, who was 3 or 4 feet away from Pate, raise a gun and begin
> firing.  Pate realized he had been shot, tried to grab the door, and
> fell to the ground, first to his knees, and then face down.  As Pate
> lay on the ground, he saw the Tahoe, with specialty tire rims and
> exhaust pipes, speeding away.
>
> Law enforcement officers and medical responders arrived within
> minutes.  When asked who shot him, Pate replied, "It was a blue
> truck."  In the ambulance en route to the hospital, when again
> asked who shot him, Pate said that it was "Mike."  Pate had been
> shot in the hip, abdomen, and back, and underwent emergency
> surgery.  Ragland was shot once in the head and died a few hours
> later.  In police interviews at the hospital and later at his home,
> Pate said that "Mike" shot him, that Mike drove a blue Tahoe with
> specialty rims, that he and Mike had argued over those rims
> sometime in February of 2004, and that Mike had threatened him.
> Pate gave police a physical description of Mike and later identified
> appellant Michael Francis as the shooter from a photographic

lineup.

During the investigation, the police received a date- and time-stamped videotape from a private surveillance company with a camera trained on the intersection of 31st Street and Portland Avenue. The tape showed an image of a blue Tahoe turning from 31st onto Portland shortly before the shooting. The police obtained the license plate number for a blue Tahoe that matched the description given by Pate. The Tahoe was registered to the mother of Francis's girlfriend who lived relatively close to the area of the shooting. The vehicle was subsequently stopped, towed, and searched pursuant to a warrant. Francis was driving the vehicle when it was stopped.

Francis was indicted by grand jury for first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2006); first-degree intentional drive-by shooting murder, Minn.Stat. § 609.185(a)(3) (2006); attempted first-degree premeditated murder, Minn.Stat. § 609.17 subd. 1 (2006); and attempted first-degree intentional drive-by shooting murder, Minn. Stat. § 609.17 subd. 1 (2006). At trial, in addition to the evidence of Pate's identification of Francis as the shooter, the state presented evidence of Francis's cell phone records which showed frequent use in the hour before the shooting, a 15-minute gap around the time of the shooting, and then the resumption of cell-phone use. The records also indicated that calls placed from Francis's cell phone shortly before the 15-minute gap were processed through the cell-site tower located within the general area of the shooting. A Portland Avenue resident testified that after hearing gunshots on May 24, 2004, he saw an SUV with a blue glow on the dashboard pass by his home. On examination at the forensic garage, Francis's Tahoe was found to have an aftermarket stereo system that would emit a blue light. Forensic evidence indicated that the victims were shot with a .44-caliber revolver, "one of the bigger caliber handguns."

Francis testified on his own behalf and denied shooting either Pate or Ragland. Although he could not recall exactly what he was doing on the evening of May 24, 2004, he testified that his "routine" between 9:00 p.m. and 11:00 p.m. on a school night was to pick up his girlfriend at her mother's home in South Minneapolis and drive with her to his home in St. Louis Park or to meet her in St. Louis Park. He denied threatening Pate and said that the argument over tire rims "never took place." He had no idea why Pate would identify him as the shooter. Francis also elicited testimony from an auto mechanic familiar with his Tahoe to cast doubt on evidence that his vehicle was involved in the shooting.

The Minnesota Supreme Court held that Petitioner was not deprived of a fair trial based on the prosecutor's conduct of eliciting inadmissible evidence, inquiring about specific acts of violence in cross-examination of a defense character witness, and making improper remarks during closing argument. State v. Francis, 729 N.W.2d 584, 590-91 (Minn. 2007). The court upheld the trial court's evidentiary rulings, including: 1) admission of cell phone records; 2) admission of surveillance videotape; 3) admission of testimony of a witness diagnosed with bipolar schizophrenia; 4) inadmissibility of evidence of an alternative perpetrator; and 5) admission of prior misdemeanor conviction as impeachment evidence. Id. at 591-92. The court also held that Petitioner was not prejudiced by the trial court's refusal to give instructions as to unintentional murder. Id. at 592. The Court further held that Petitioner's "allegations of inadequate legal representation are refuted by the record and otherwise fail to show that had trial counsel presented additional evidence and otherwise addressed [Petitioner's] concerns, the result would have been different." Finally, the Court held:

> [Petitioner] challenges the seizure of his Tahoe, the jury selection process, the admission of photographic lineup and the admission of "blurry" photographs; he asserts discovery violations, juror misconduct, and the denial of a speedy trial; and he also states that his convictions rest on invalid laws and that consecutive sentencing is in error. After a careful examination of these claims, we find them meritless.

Id. at 592-93.

On March 24, 2008, Petitioner filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. He raises six grounds for relief. In Ground One of the petition, Petitioner alleges "the doctrine of transfer [transferred intent] relieved the State of proving every element of a criminal offense beyond a reasonable doubt." In Ground Two of the petition, Petitioner alleges, "[t]he selection of the grand and petit jury was unconstitutional." Ground Three is a claim for

ineffective assistance of trial counsel.  In Ground Four, Petitioner alleges, "the identification of Petitioner was unreliable and corroboration was insufficient rendering evidence insufficient as a matter of law."   In Ground Five of the petition, Petitioner alleges the prosecutor committed misconduct during trial and closing argument.  In Ground Six, Petitioner alleges, "[i]t was an abuse of discretion of Trial Court to admit witness Moana Teppen's testimony, photographs, phone records, petitioner's misdemeanor conviction and not questioning witness Marvin Pate on possible bias or untruthful testimony."  Petitioner also filed a sixty-six page "Memorandum to Habeas Corpus Petition," describing his claims in detail.  (Docket No. 2.)

In response to the habeas petition, Respondent states, it is "Respondent's position that all of the issues currently raised have been exhausted before the Minnesota state courts." (State's Memorandum at 2, Docket No. 15.)  This is an express waiver of exhaustion.  See 28 U.S.C. § 2254 (b)(2), (3).  Respondent also asserts that none of the issues raised are cognizable of federal habeas corpus relief because the Minnesota Supreme Court decided the issues consistent with federal precedent, and the factual findings of the Minnesota Supreme Court are presumed correct, unless rebutted by Petitioner.

In reply, Petitioner asserts that the state court failed to address his due process claim related to the doctrine of transferred intent.  (Reply to State's Answer, at 1-2, Docket No. 19.) With respect to his claim regarding "the unconstitutional racial composition" of the grand and petit juries, Petitioner asserts the state court finding that the claim was meritless is an unreasonable determination of the facts in light of the evidence presented.  (Id. at 2-3.) Petitioner argues that he was denied an evidentiary hearing on his ineffective assistance of counsel claim, and should be allowed a hearing by the habeas court on that issue.  Petitioner contends that had he been given this opportunity, he could have presented evidence that would

be strong enough to raise a probability that but for counsel's errors, the outcome of the trial would have been different.  (Id. at 4-5.)  With respect to his insufficiency of the evidence claim, Petitioner asserts he has laid out every objective factual problem, impossibility, and improbability in the evidence at trial, and the Minnesota Supreme Court decision on this claim presents an unreasonable determination of the facts in light of the evidence presented.  (Id. at 5.)  Petitioner contends the Minnesota Supreme Court failed to address all instances of prosecutorial misconduct that he raised, and its decision was based on an unreasonable determination of the facts in light of the evidence presented.  Finally, Petitioner asserts the Minnesota Supreme Court's rulings on his evidentiary claims "resulted in a decision that was based on an unreasonable determination of the facts and was contrary to State and Federal law denying Petitioner's Due Process of law."  (Id. at 6.)

## II.      REQUEST FOR EVIDENTIARY HEARING

If the facts a petitioner seeks to prove would not entitle him to habeas relief, then an evidentiary hearing need not be granted.  Johnston v. Luebbers, 288 F.3d 1048, 1059 (8th Cir. 2002).  Dismissal of a habeas petition without a hearing is proper where the dispute can be resolved on the basis of the record.  Wallace v. Lockhart, 701 F.2d 719, 729 (8th Cir. 1983).  Petitioner seeks to prove his trial counsel was unprepared and failed to adequately represent him because Petitioner did not pay counsel the amount promised.  As discussed below, even if Petitioner could prove that counsel's performance was objectively unreasonable, this Court finds that, based on the entire record, the outcome of trial was not likely to have been different but for counsel's alleged deficiencies.  Thus, an evidentiary hearing is unnecessary.

## III.     DISCUSSION

Habeas review is available to determine whether there has been a violation of the

Constitution or laws of the United States.  28 U.S.C. § 2254(a).  In 1996, Congress passed the

Anti-terrorism and Effective Death Penalty Act "AEDPA" which limited habeas review to

adjudications that:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

This Court will apply the AEDPA standard to Petitioner's ineffective assistance of

counsel claim because the Minnesota Supreme Court articulated its reasoning, under federal law,

for denying this claim.  However, under AEDPA,

> "where the state court has not articulated its reasoning, federal courts are obligated to conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented . . . .  [citations omitted.]  That independent review, however, is not a full, de novo review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA."

Harris v. Stovall, 212 F.3d 940, 943 (6th Cir. 2000), cert. denied, 532 U.S. 947 (2001).[1]  In the

state courts, Petitioner raised claims under both state and federal law.  The Minnesota Supreme

Court addressed all of Petitioner's claims, with the exception of his ineffective assistance of

counsel claim, under state law.  Thus, the Minnesota Supreme Court did not articulate its

reasoning for dismissing Petitioner's *federal constitutional claims* as alleged in Grounds One,

---

[1]    The standard of review prescribed by the Sixth Circuit in Harris has been approved by numerous federal courts, including the Eighth Circuit Court of Appeals in Niederstadt v. Nixon, 465 F.3d 843, 846 (8th Cir 2006), rehearing en banc granted, opinion vacated on other grounds (Dec. 13, 2006).

Two, Four, Five and Six of the habeas petition.  Therefore, the Court will independently review

these claims to determine whether the state court decision is contrary to federal law,

unreasonably applies clearly established law, or is based on an unreasonable determination of the

facts in light of the evidence presented.

      A.      Ineffective Assistance of Counsel (Ground Three)

Ineffective assistance of counsel claims arise under the Sixth Amendment's right to

counsel and are analyzed under the test announced by the United States Supreme Court in

Strickland v. Washington, 466 U.S. 668 (1984).  To prevail on an ineffective assistance of

counsel claim, the petitioner must prove that counsel's representation fell below an objective

standard of reasonableness.  Id. at 687-88.  The petitioner must also prove there is a reasonable

probability that, but for counsel's errors, the result of the proceeding would have been different.

Id. at 694.  Both the performance and prejudice components of ineffective assistance of counsel

claims are mixed questions of law and fact.  Id. at 698.

Petitioner alleges he was deprived of the right to effective assistance of counsel because

counsel did not "fulfill his obligation to conduct a thorough investigation of the defendant's

background, interview Alibi witnesses, interview the eyewitness/victim, or interview the

character witness (Hudson) or other defense witnesses (Evertz)."  (Petitioner's Memorandum to

Habeas Corpus Petition at 53).  Petitioner asserts his counsel's failures occurred because

Petitioner failed to pay counsel the amount of money promised.  (Id.)  Petitioner alleges he was

deprived of the opportunity to prove this because he was denied a post-conviction evidentiary

hearing.  (Id.)  Petitioner further alleges his trial counsel failed to hire an investigator to procure

defense evidence, failed to effectively cross-examine witnesses, was unwilling to call alibi

witnesses, failed to consult a forensic expert regarding a bullet hole, failed to make proper

objections, betrayed Petitioner by questioning him about his involvement in drug activities,

urged Petitioner to demand a speedy trial against Petitioner's interest, and only met with

Petitioner three times before trial.

The Minnesota Supreme Court followed the correct legal standard, under <u>Strickland v.</u>

<u>Washington</u>, for analyzing the claim. <u>Francis</u>, 729 N.W.2d at 592. The court gave two reasons

for rejecting Petitioner's claim. First, the court noted that tactical decisions, including what

evidence to present and which witnesses to call, are left to the discretion of trial counsel. <u>Id.</u>

Second, the court agreed with the post-conviction court that "Francis's allegations of inadequate

legal representation are refuted by the record and otherwise fail to show that had trial counsel

presented additional evidence and otherwise addressed Francis's concerns, the result would have

been different." <u>Id.</u>

This Court has reviewed the trial transcript in its entirety, and finds that the Minnesota

Supreme Court reasonably applied federal law, and reasonably determined the facts in light of

the evidence presented in concluding that if trial counsel had addressed Petitioner's concerns, the

result of the trial likely would not have been different. The trial transcript generally reveals that

trial counsel zealously advocated for his client.

The majority of Petitioner's concerns involve matters of discretionary trial tactics. When

counsel's tactical decisions are made after thorough investigation, they are virtually

unchallengeable on appeal. <u>Winfield v. Roper</u>, 460 F.3d 1026, 1041 (8th Cir. 2006.) Here,

counsel chose not to call Petitioner's girlfriend as an alibi witness. This was a reasonable

decision because evidence was presented at trial that Petitioner and his girlfriend called each

other on their cell phones shortly before the shootings (Trial Transcript, hereafter "T." at 1519,

1538, 1541-42, 1548, 1552, 1556), which pretty strongly suggests Petitioner was not with his

girlfriend at the time.

There is one issue that stands out in the trial transcript.  The defense called Petitioner's mother, Cynthia Hudson, to testify as to Petitioner's nonviolent reputation.  On cross-examination, Ms. Hudson was impeached because she herself had called the police on more than one occasion due to what the jury could have construed as Petitioner's violence toward her.  (T. 1726-39).  The prosecution was able to bring in evidence of other incidents that would not otherwise have been admissible if the defense had not called a character witness to testify to Petitioner's nonviolent reputation.  (Id.)  Reasonable counsel would not have called this witness after investigating potential impeachment evidence.  The trial court ameliorated the potential adverse effect of this witness' testimony by giving a limiting instruction.

The State's case was very strong, and even if defense counsel had not called Ms. Hudson, the outcome of the trial was not likely to have been different.  This case involved the shooting of two people, one of whom lived to testify that Petitioner was the shooter.  The Court is not persuaded by Petitioner's arguments that the eyewitness victim, who was only three or four feet away, could not possibly have identified the shooter, nor by Petitioner's arguments that forensic evidence could have exonerated him.

In addition to the eyewitness testimony, the prosecution submitted videotape evidence and still photographs taken from the video depicting a vehicle, which was distinctive enough to be identified as Petitioner's Tahoe, very near the crime scene just before the shooting.  (T. 1670-74.)  In fact, a defense witness testified that the rims on Petitioner's Tahoe were distinctive, and he had never seen any other rims like them in Minneapolis.  (T. 1755).  The prosecution also offered cell phone records and expert testimony, from which a jury could have determined that Petitioner used his cell phone in the vicinity of the crime leading up to and then after the crime

was committed.  This is likely why the defense raised the issue of Petitioner's drug dealing, it provided an alternative explanation for his cell phone use in south Minneapolis.  See Francis, 729 N.W.2d at 591 (describing Petitioner's testimony).  Petitioner has not identified any defense that could have been presented, which would likely have changed the outcome of the trial.  Thus, he has not met the prejudice prong of the Strickland test.

B.      Due Process Claim Based On Doctrine of Transferred Intent.  (Ground One)

The Minnesota Supreme Court did not address the merits of Petitioner's federal due process claim, but instead addressed only state law.  Therefore, this Court will independently review the due process claim.

Petitioner argues that,

> [t]he doctrine of transferred intent is unconstitutional because it irrefutably and conclusively relieved the State of its burden of persuasion by removing the elements of intent and premeditation of Pamela Ragland's death from the case "entirely" if the State proved the predicate fact that someone premeditated and intended the death of Pate.

(Petitioner's Memorandum to Habeas Corpus Petition at 18.)  The jury was instructed,

> If the defendant acted with premeditation and intent to cause the death of Marvin Pate, the element of premeditation and intent to kill is satisfied even though the defendant did not intend to kill Pamela Ragland.

(Id. at 17 citing T. 2057.)

The Due Process Clause of the Fourteenth Amendment of the United States Constitution "forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt."  Fiore v. White, 531 U.S. 225, 228-29 (2001).  However, if a state court interprets state law such that the doctrine of transferred intent applies to satisfy elements of a specific state crime, the habeas court is bound by that decision.  Bradshaw v. Richey, 546 U.S.

11

74, 75-77 (2005) reh'g denied 546 U.S. 1146 (Jan. 17, 2006).

Petitioner was charged with premeditated murder of Pamela Ragland.  The evidence was such that the jury might have inferred Petitioner intended to shoot Ragland because she witnessed Pate's shooting.  The jury may also have inferred that Petitioner intended only to kill Pate, but mistakenly shot and killed Ragland, who was in close proximity, and only injured Pate.  The jury was instructed on the elements of first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2006).  (T. 2055-56.)  Additionally, the jury was instructed that if it found premeditation and intent to kill Pate, then premeditation and intent to kill Ragland was also satisfied.  (T. 2057.)

In State v. Hall, the Minnesota Supreme Court held that the doctrine of transferred intent applies to the crime of premeditated murder where, at the time of his actions, the defendant intended to kill one person, but instead accidently killed another person.  722 N.W.2d 472, 477 (Minn. 2006).  This was a reasonable theory in this case, and the jury was so instructed.  Therefore, this Court is bound by the state court's ruling that the doctrine of transferred intent applies to the crime of premeditated murder, and the elements of premeditation and intent can be met in this manner without violating Petitioner's due process right to proof of all of the elements of a crime beyond a reasonable doubt.

C.     Unconstitutional Jury Selection.  (Ground Two)

Petitioner alleges his Sixth and Fourteenth Amendment rights to a representative jury venire were violated because there were zero African Americans on his grand jury, and African Americans were under represented on his petit jury.  (Petitioner's Memorandum to Habeas

12

Corpus Petition at 21.)  Petitioner offered the monthly averages of racial composition[2] for the

years 2002-2006 to indicate that there is a racial disparity in the Hennepin County jury selection

system, including the month that Petitioner's grand jury was selected.  (Id. at 21-22; Appendix at

1-3, Docket No. 3.)  Petitioner also offered statistics on petit jury pool racial composition for

2002-2006.  (Appendix at 6-49, Docket No. 3).

Petitioner alleges that he has established a Sixth Amendment fair cross section challenge

by showing that over a significant period of time the group of eligible voters in question has

been significantly under represented, and that this results from systematic exclusion.  (Id. at 22.)

Petitioner admits that the statistical evidence he offered does not demonstrate discrimination, but

contends that the fact that there was zero minorities on his grand jury is a prima facie violation.

(Id. at 23).  Petitioner also asserts that all potential grand jurors complete a questionnaire in

which they are asked to identify their race, which provides an opportunity for racial

discrimination.  (Id. at 24; Appendix at 52, Docket No. 3.)

The Minnesota Supreme Court, without further discussion, found Petitioner's jury

selection process claim to be meritless.  Therefore, this Court will independently review

Petitioner's claims under the Sixth and Fourteenth Amendments of the U.S. Constitution.

A defendant in a criminal case is not constitutionally entitled to a proportionate number

of his race on his grand or petit jury.  U.S. v. Childress, 715 F.2d 1313, 1314 (8th Cir. 1983).

---

[2]       These documents, on their face, do not indicate that they represent information
obtained from Hennepin County regarding its jury compositions. The same is true
of the documents entitled "Petit Jury Pool Racial Composition."  However,
Petitioner also included a copy of a letter to him from Lynn Lahd, the Court
Operations Supervisor, Jury Division, Hennepin County District Court, stating
that she enclosed such documents with her letter.  (Appendix at 50, Docket No.
3.)

However, under the Sixth Amendment of the U.S. Constitution, the jury selection process must

draw prospective jurors from a fair cross-section of the community because a criminal defendant

is entitled to an impartial jury.  U.S. v. Horne, 4 F.3d 579, 587 (8th Cir. 1993).  To establish a

violation, the petitioner:

> "must show (1) that the group alleged to have been excluded is a
> 'cognizable' or 'distinctive group' within the community; (2) that
> representation of this group in venires was not fair and reasonable
> in relation to the number of such persons in the community; and
> (3) that the under representation was due to the systematic
> exclusion of the group in the jury selection process.

Id. at 588 (citing Duren v. Missouri, 439 U.S. 357, 364 (1979).  The Constitution does not

mandate that every jury that tries a criminal defendant "mirror the community."  Id. (quoting

Taylor v. Louisiana, 419 U.S. 522, 538 (1975).  A discrepancy on a single venire panel does not

demonstrate a systematic exclusion.  Id. (quoting United States v. Womack, 985 F.2d 395, 397-

98 (8th Cir. 1993) (citation omitted)).  Systematic exclusion means an exclusion "inherent in the

particular jury-selection process utilized."  Smith v. Berghuis, 543 F.3d 326, 339 (6th Cir. 2008)

(quoting Duren, 439 U.S. at 366).  Unlike an equal protection claim under the Fourteenth

Amendment, the fair cross section claim does not require a showing that the selection procedure

is susceptible to abuse, or not race neutral.  Id. at 335-36.

The jury selection process used during the year 2004 in the Fourth Judicial District,

Hennepin County, was fully set forth in a case in this district court.  See Report and

Recommendation, Miles v. Dosal, Civil Nos. 04cv4072 DWF/JSM, 04cv4111 DWF/JSM,

04cv4133 DWF/JSM (D.Minn. August 5, 2005) (hereafter "Report and Recommendation"),

adopted by Order dated Sept. 27, 2005, 2005 WL 2415973, aff'd, Miles v. Dosal, 221 Fed.

Appx. 499 (8th Cir. 2007).  The Fourth Judicial District of Minnesota creates its master source

list of prospective grand and petit jurors by merging the Minnesota voter registration list, the

Minnesota Driver's license list, and the Minnesota identification list.  <u>Report and</u>

<u>Recommendation</u> at 8.  Each year approximately 40,000 names are randomly generated by

computer from the master source list, which does not contain any race information, to create the

master juror list for that year.  <u>Id.</u>  Petit jurors are randomly selected by computer from the

master juror list, and when summoned, are provided a questionnaire which asks for race

information.  <u>Id.</u> at 7-8.  Prospective jurors are not disqualified for either grand jury or petit jury

service if they refuse to answer the race question.  <u>Id.</u> at 8-9.  Of the prospective jurors for any

given week who have not been disqualified or excused, names are randomly drawn by computer

to create a jury panel for a specific case.  <u>Id.</u> at 10.  The race information from the questionnaire

is used only to monitor the representativeness of jury panels, to check for discrimination, and in

the event a party to a case makes a legal challenge to the jury  in his case.  <u>Id.</u> at 7-8.

One hundred and twenty-five prospective grand jurors are randomly selected by

computer from the master list three times a year, and they are summoned and issued a

questionnaire which includes a race identification question.  <u>Id.</u> at 11.  After excusals are granted

and disqualifications are determined, the first thirty people on the list who have not been excused

or disqualified are informed that they must appear for grand jury service on a particular date.  <u>Id.</u>

Of the thirty people who report for service, the first twenty-three are assigned as jurors and the

remaining as alternates.  <u>Id.</u> at 12.  The court held that the Fourth Judicial District's juror

selection process is race neutral and not susceptible to abuse.  <u>Report and Recommendation</u> at

24.

The information Petitioner submitted from the Census Bureau for the year 2004, indicates

that African Americans made up 10.2% of the population of Hennepin County.  (<u>Appendix</u> at 4,

Docket No. 3).  It does not indicate what percentage of this population was qualified for jury service.  Throughout the year 2004, the percentage of African Americans in weekly petit jury pools ranged from 1.5% to 14.6%.  (Appendix at 23-30, Docket No. 3). Petitioner also submitted absolute and comparative disparity figures[3] for the year 2004.  (Appendix at 2, Docket No. 3). The average comparative disparity in monthly racial compositions for the year 2004 was 29.89%, and the absolute disparity was 3.1.  (Id.)

African Americans are a distinctive group, thus satisfying the first element of the prima facie case under the Sixth Amendment.  See e.g., Peters v. Kiff, 407 U.S. 493, 500 n.9 (1972). Even if the Court were to assume the numerical disparity was sufficient to establish the second element of the claim, "it is black letter law that 'numerical disparities resulting from the use of voter registration lists do not violate a defendant's Sixth Amendment rights.'" Fink v. Fabian, 2007 WL 4209091 at *14, Civ. No. 06-3908 (RHK/RLE) (quoting United States v. Ireland, 62 F.3d 227, 231 (8th Cir. 1995) (Grand Jury), citing United States v. Garcia, 991 F.2d 489, 492 (8th Cir. 1993) (petit jury)).  "In addition to a numerical disparity, a defendant must demonstrate that the voter registration qualifications are suspect, or that the jury selection procedure is administered in a discriminatory manner."  United States v. Ireland, 62 F.3d 227, 231 (8th Cir. 1995).

The fact that Petitioner's grand jury did not have any African American jurors and his petit jury had only one African American juror does not establish a prima facie case, as

---

[3]      The absolute disparity test compares the members of a distinctive group that are jury eligible with those that appear on the venire.  Smith, 543 F.3d at 337. "Comparative disparity is determined by dividing the absolute disparity of a group by the percentage of that group in the population."  U.S. v. Orange, 447 F.3d 792, 798 (10th Cir. 2006).

Petitioner suggests.  A discrepancy on a single venire panel does not demonstrate a systematic exclusion.  Horne, 4 F.3d at 588.  The use of voter registration lists, driver's license lists, and identification lists for creation of a master list does not systematically exclude African Americans.  See e.g., United States v. Warren, 16 F.3d 247, 251-52 (8th Cir. 1994). Furthermore, the inclusion of a question to identify race on a jury questionnaire does not render the juror selection process suspect.  Miles, 2005 WL 2415973, at *2.  The Miles Court stated,

> [t]he constitutional irony of the Plaintiff's position is that state and federal courts across the United States have sought information related to race to prohibit race discrimination and other forms of discrimination during jury selection to increase representation of persons of color and other minorities in both grand jury pools and petit jury pools.

Id. (citing the May 1993 Minnesota Supreme Court Task Force Report on Racial Bias in the Judicial System).  For these reasons, Petitioner's Sixth Amendment claim fails.  Furthermore, Petitioner's Fourteenth Amendment equal protection claim must also fail because Petitioner has failed to show that the jury selection process is susceptible to abuse or not racially neutral.  See Warren, 16 F.3d at 252 (describing elements of equal protection claim.)  The Court notes that according to the petit jury pool racial composition statistics submitted by Petitioner, there were some weeks when African Americans were over represented in petit jury pools, and some weeks when African Americans were under represented.  This suggests that the difference merely results from chance.  Id. at 252 (finding no discernable reason for the differences among the jury pools other than chance).  The Minnesota Supreme Court's denial of this claim on its merits is consistent with federal law.

    D.    Insufficient Evidence.  (Ground Four)

Petitioner alleges the evidence was insufficient to identify him as the shooter, and

corroborating evidence of Pate's identification of Petitioner was insufficient. (Petitioner's Memorandum to Habeas Corpus Petition at 26-34).  Petitioner alleges Pate gave inaccurate information about the lighting conditions at the scene of the shooting, as evidenced by crime scene photos and the physical impossibility of Pate's testimony.  (Id. at 27).  Petitioner alleges there was insufficient time for Pate to have paid close attention to the identity of the shooter. (Id.)  Finally, Petitioner asserts the length of time between the crime and identification does not suggest reliability.  (Id. at 28.)  He asserts that Petitioner did not give the name of the suspect to the police immediately after the shooting.  (Id. at 29.)

As to corroborating evidence, Petitioner contends the video surveillance tape and photographs did not show the vehicle at the crime scene, but instead two blocks away.  (Id. at 30.)  Petitioner also argues the customized characteristics of Petitioner's Tahoe were not visible in the tape or photographs.  (Id. at 30.)  Petitioner points to witness Michael Carlson's testimony that he could not be absolutely sure that the photographs shown to him depicted Petitioner's Tahoe.  (Id. at 31 citing T. 1712-13.)

Petitioner asserts alternative inferences, other than the State's theory, can be drawn from the cell phone records.  (Id. at 31-34).  The State's theory was that Petitioner was not at home when the shooting occurred, he was in the area of the shooting, and drove straight home after the shooting.  (Id. at 31.)  The State also theorized that Petitioner was not with his girlfriend near the time of the shooting, because she was trying to call his cell phone.  (Id. at 34).

In reviewing a sufficiency of the evidence claim on a habeas petition, the habeas court must view the evidence in the light most favorable to the government and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Becker v. Lockhart, 971 F.2d 172, 175 (8th Cir. 1992) (quoting Jackson v.

<u>Virginia</u>, 443 U.S. 307 (1979) (emphasis in original)).  The evidence meets that standard here.

The evidence, taken in the light most favorable to the government shows that while Pate was in the ambulance on the way to the hospital after being shot, he identified that a person named "Mike" driving a blue truck had shot him.  (T. 1273-76.)  Pate testified that he knew Mike, and had an argument with him about the tire rims on Mike's Tahoe.  (T. 1169-91.)  The argument ended with Mike telling Pate "you're a dead man."  (T. 1190.)

Pate testified that Mike drove a distinctive looking blue Tahoe with specialty rims, special exhaust pipes, after market lights, and tinted windows.  (T. 1174-76.)  After police located a similar Tahoe and connected it to Petitioner, they asked Pate to identify the person who shot him from a photographic line-up.  <u>Francis</u>, 729 N.W.2d at 588.  Pate identified Petitioner. <u>Id.</u>  At trial, Pate testified that on the night he and Ragland were shot, he saw Mike sitting in the front seat of a vehicle that stopped three or four feet away from him on Portland Avenue.  (T. 1206.)  He then saw a barrel of a gun, heard shots, felt pain, and as he was falling, clearly saw the distinctive rims and exhaust pipes of the blue Tahoe as it drove away.  (T. 1210.)  Pate identified Petitioner's Tahoe from a photograph produced from a video taken near the scene of the crime just before the shooting occurred.  (T. 1223-24, 1670-73.)  Thus, there was corroborating evidence from which a reasonable juror could infer that Petitioner's Tahoe was near the scene of the crime close in time to when the crime was committed.  The evidence was more than sufficient to convict Petitioner.  Although Petitioner testified that he did not commit the crime, the evidence was such that a reasonable juror could find him not credible.  The Minnesota Supreme Court's denial of this claim was based on a reasonable determination of the facts in light of the evidence presented.

E.      <u>Prosecutorial Misconduct.  (Ground Five)</u>

First, Petitioner alleges the prosecutor failed to prepare her witnesses, several of whom improperly referred to Petitioner's drug dealing activities.  (Petitioner's Memorandum to Habeas Corpus Petition at 35.)  Petitioner also complains that a State witness was allowed to give her opinion about Petitioner's guilt when she testified, "[t]here was a gun in my car and I thought it was the weapon that was used to kill this girl."  (Id. citing T. 1335.)  Petitioner alleges the prosecutor elicited inadmissible and prejudicial testimony from a sergeant who testified that he received information about Petitioner from a gang unit officer.  (Id. at 36.)  There was no evidence that Petitioner was affiliated with a gang.  Petitioner also alleges it was misconduct for the prosecutor to allow the sergeant to testify that he looked in the arrest database to see if Petitioner's photograph matched Pate's description, because this caused the jury to learn that Petitioner had an arrest record.  (Id. at 36.)

Second, Petitioner alleges the prosecutor committed misconduct when cross-examining him by appealing to the jury's passions or prejudice.  Petitioner alleges the prosecutor exploited Pate's testimony that Petitioner sold marijuana, and Cynthia Hudson's testimony that Petitioner got off on the wrong foot by selling drugs.  (Petitioner's Memorandum to Habeas Corpus Petition at 36-37.)  The prosecutor questioned Petitioner about his drug dealing activities and how much money he made.  (Id. at 37-38 citing T. 1813-17.)

Petitioner also alleges the prosecutor committed misconduct when she cross-examined him about pleading guilty for possessing a gun, when the court had earlier ruled the evidence inadmissible.  (Id. at 38-41.)  Petitioner testified that he carried a gun one time, and the prosecutor asked him if that one time was in September 2003.  (T. 1818.)  Petitioner said, "No, I wasn't carrying that gun."  (Id.)  It was the prosecutor's position that Petitioner's testimony opened the door for questioning on whether he pled guilty to possessing a gun in September

2003.  (T. 1819.)  The defense requested a mistrial, but the trial judge denied the motion and

overruled the objection.  (Id. at 38-41 citing T. 1813-26.)

Third, Petitioner contends the prosecutor improperly commented on his presence at trial

by insinuating that he tailored his testimony to fit the phone records.  (Id. at 41.)  Petitioner

characterized the prosecutor's cross-examination as ridiculing his testimony.  (Id. at 42.)

Fourth, Petitioner argues the prosecutor compounded her misconduct by using highly

inflammatory language and expressing her opinion as to the defendant's guilt in her closing

argument.  (Id. at 43.)  Petitioner points to the prosecutor's comments that "the defendant was

too busy shooting people," "he's a smart guy and he doesn't want his drugs right by the St. Louis

Park Police Department," "He's a small man that maybe needs a big truck with some expensive,

shiny rims on it to make him feel like a big man and who needs a gun in his hand to make him

feel like the big man that he's not," and "he's a person that thinks he's smart, that thinks he can

outwit the system . . ."  (Id. at 43-44 citing T. at 1977, 1981, 1997, 1999, 2000.)

Fifth, Petitioner argues the prosecutor misstated evidence and misled the jury.  (Id. at 45.)

Petitioner alleges the prosecutor incorrectly stated that Petitioner testified he was with his

girlfriend the entire evening of May 24, 2004, but he only testified that he was with her at the

time of the shooting.  (Id.)[4]  Petitioner also alleges the prosecutor misstated the expert's

testimony regarding the cell phone records.  The prosecutor said,

> [Petitioner] didn't know that there were going to be cell phone
> records to place the defendant right at the scene of the shooting at
> the time the shooting happened . . .

(T. 2003.)  Petitioner points out that the expert testified the phone records can not pinpoint a

---

[4]     The Court finds this argument to be without merit because Petitioner indeed
testified that he was with his girlfriend the entire evening.  (T. 1847-48.)

caller's exact location.  (Id. at 46 citing T. 1560.)[5]

Petitioner also alleges the prosecutor misled the jury into drawing an inference that witness Charles Everetz identified Petitioner's blue Tahoe in the video or in the still photographs created from the video.  (Id. at 47.)[6]  Petitioner further contends the prosecutor improperly argued that Petitioner was shot in the back after falling to the ground.  (Id. at 47.)  The prosecutor said, "He wanted him dead, and that third bullet most likely went into his back after he was on his way down or down on the ground."  (T. 1988).

Sixth, Petitioner alleged the prosecutor impermissibly called him a liar, and insinuated that he was lying.  (Id. at 48-49 citing T. 1998-99, 2003.)  The prosecutor said, "Who has the biggest reason to lie and the biggest reason to hide something?"  (T. 1998).  The prosecutor also said, "He evaded things.  He told you what he wanted to hear and didn't answer a question in a straight forward, "honest" way the entire time I was cross-examining."  (T. 1999).

Finally, Petitioner alleges the prosecutor improperly testified that Petitioner had a duty to prove why Pate would accuse him of committing the crime.  (Id. at 49.)  The prosecutor said "He provided absolutely no motive" (T. 1998) and "They have not told you any motive in any way that Marvin Pate would blame what he thought was his impending death on Mike if that wasn't the case."  (T. 2034.)

The Minnesota Supreme Court agreed with the trial court that the prosecutor only

---

[5]    Petitioner is correct that it was inaccurate for the prosecutor to state the cell phone records placed Petitioner "right at the scene of the shooting."  However, the closing argument considered in its entirety made clear the cell phone records could only place Petitioner within a certain area, as demonstrated on a map that was admitted into evidence, and not an exact location.  (T. 1974, 1976-78.)  Thus, the error was harmless.

[6]    The Court finds this argument to be without merit.

inadvertently elicited objectionable comments about Petitioner's arrest record, and the court provided curative instructions. Francis, 729 N.W.2d at 590. The court held the prosecutor's comments about Petitioner's drug dealing were proper because Petitioner testified that he earned a living selling marijuana on a daily schedule from when he got up until nine or eleven at night. Id. at 591. He testified that he used his cell phone for drug dealing, and then went to meet the buyers "somewhere, maybe in south Minneapolis." Id.

The Minnesota Supreme Court found that the prosecutor's comments about Petitioner being a small man who needed shiny rims and a gun to feel big were improper gratuitous character attacks. Id. However, the court did not find the prosecutor's closing argument as a whole to be so unduly prejudicial as to deny Petitioner a fair trial. Id. The Minnesota Supreme Court cited state law in support of its analysis of Petitioner's prosecutorial misconduct claims. Therefore, this Court will independently review Petitioner's claims under federal law.

The role of an attorney in closing arguments is to help the jury analyze, evaluate, and apply the evidence, "arguments that transcend such boundaries are improper." U.S. v. Beckman, 222 F.3d 512, 527 (8th Cir. 2000). "A prosecutor's comments are improper if they 'are likely to inflame bias in the jury and to result in a verdict based on something other than the evidence.'" U.S. v. Crawford, 523 F.3d 858, 861 (8th Cir. 2008) (quoting United States v. Mullins, 446 F.3d 750, 759 (8th Cir. 2006)). "As a general rule, 'prosecutorial misconduct does not merit federal habeas relief unless the misconduct infected the trial with enough unfairness to render [a] petitioner's conviction a denial of due process.'" Stringer v. Hedgepath, 280 F.3d 826, 829 (8th Cir. 2002) (quoting Louisell v. Dir. of Iowa Dept. of Corr., 178 F.3d 1019, 1023 (8th Cir. 1999) (citations omitted)). To find a due process violation, the prosecutor's comments must be "so egregious that they fatally infect [] the proceedings and render [] [a defendant's] entire trial

fundamentally unfair." Id. (quoting Moore v. Wyrick, 760 F.2d 884, 886 (8th Cir. 1985). Thus, the petitioner must show that "absent the alleged impropriety the verdict probably would have been different." Id. (quoting Anderson v. Goeke, 44 F.3d 675, 679 (8th Cir. 1995) (citations omitted)).

After a complete review of the trial transcript, this Court concludes the Minnesota Supreme Court's decision was consistent with federal law. It does not appear that the prosecutor was attempting to elicit inadmissible evidence from Sergeant Jackson that Petitioner had a criminal record or that he was associated with a gang, although such testimony might have been prevented by the prosecutor. (T. 1596-99, 1605-1613). Nevertheless, the court immediately gave a curative instruction following a side bar discussion. (T. 1654-56.) See U.S. v. Eagle, 515 F.3d 794, 804-5 (8th Cir. 2008) ("in order to determine whether the defendant was deprived of a fair trial, we consider the following three factors: 1) the cumulative effect of the misconduct; 2) the strength of the properly admitted evidence of the defendant's guilt; and 3) the curative actions, if any, taken by the district court.")

Furthermore, the prosecutor did not elicit Moana Teppen's opinion about whether Petitioner killed someone. Teppen testified about hearing Petitioner make a statement about "popping" someone. (T. 1334.) The prosecutor asked her why she contacted the police, and her answer was that Petitioner was in custody for murder, and she thought she found the gun that was used to kill the girl. (T. 1333-36.) Teppen also testified that the police said it was not the gun used in the murder. (T. 1336.)

The prosecutor did not commit misconduct by cross-examining Petitioner about his drug dealing activities or his possession of a gun in September 2003, because the court ruled the defense opened the door to those issues through Petitioner's testimony. (T. 1766-67, 1804,

24

1813-24.)  Furthermore, it was proper for the prosecutor to question Petitioner on his explanation for the cell phone record evidence.  See U.S. v. Bartolotta, 153 F.3d 875, 877-78 (8th Cir. 1998) (expressing doubt that prosecutor committed misconduct in cross examination regarding the alibi).  As to the prosecutor's remarks in closing argument that the third bullet "most likely went into [Pate's] back on his way down or down on the ground," this was a fair inference the jurors could draw based on Dr. Cummings' testimony that one of Pate's wounds was consistent with an entrance wound in his left flank, and with Pate's testimony as to how and where he was standing when he was shot.  (T. 1425-27 and 1202-08.)

Although the prosecutor remarked that "[Petitioner] provided absolutely no motive" for Pate, the eyewitness, to lie about Petitioner being the shooter, it was unlikely the jury interpreted this as an instruction on the burden of proof.  At the end of closing arguments, the trial judge carefully instructed the jury. (T. 2035-77.)  The prosecutor's remarks about Pate's motive did not make the trial fundamentally unfair.

In closing argument, it is permissible for a prosecutor to point to evidence suggesting the defendant's testimony was not credible, but the prosecutor can not directly express his own opinion that the defendant is guilty.  See U.S. v. Peyro, 786 F.2d 826, 831-32 (8th Cir. 1986 (prosecutor's statement "the man is an obvious liar" was improper, but evidence of guilt was substantial, so reversal was not required); U.S. v. French, 88 F.3d 686, 689 (8th Cir. 1996) (finding no misconduct where prosecutor indirectly expressed opinion, but primarily left the question of defendant's credibility to the jury.)  If the prosecutor did not use such words as "I believe" or "I think," as in this case, it can be difficult to draw the line between a characterization based on the evidence and a personal belief.  The prosecutor here stepped over the line when she said that Petitioner "didn't answer a question in a straight forward, honest way

25

the entire time I was cross-examining," but her other statements as to defendant's credibility were proper because they were more directly related to the evidence.  As discussed below, prosecutorial misconduct did not render the trial fundamentally unfair.

Also in closing argument, the prosecutor's comments about Petitioner being a small man who needs shiny rims and a gun to feel big were improper remarks intended to inflame the prejudice of the jury.  Appeals to the prejudice of the jurors during closing argument are improper.  See Kellogg v. Skon, 176 F.3d 447, 451-52 (8th Cir. 1999) (calling defendant "monster," "sexual deviant," and "liar" created inflammatory prejudice, but did not make entire trial fundamentally unfair).  To be entitled to habeas relief, Petitioner must show that absent the impropriety, the result of the trial probably would have been different.  As described above, the State had a strong case based on the victim's identification of Petitioner and identification of Petitioner's distinctive vehicle, the videotape evidence, and the cell phone record evidence.  The prosecutor's improper remarks about the defendant in closing argument likely played little or no role in the jury's verdict.  Even if all of the *alleged* misconduct considered cumulatively were absent, the verdict was still likely to be the same.  See U.S. v. Wadlington, 233 F.3d 1067, 1080 (8th Cir. 2000) (reviewing cumulative effect of misconduct and finding defendant was not denied a fair trial.)

     F.    <u>Due Process Violations in Evidentiary Decisions.  (Ground Six)</u>

Petitioner alleges the trial court abused its discretion and violated his right to a fair trial, and right to due process by:  1) admitting the testimony of Moana Teppen; 2) allowing the prosecutor to impeach him with a prior conviction for a misdemeanor possession of a firearm without a permit; 3) by refusing the defense the opportunity to cross examine Pate on why he was held in jail for not showing up for a meeting with the prosecution; 4) admitting unverified

videotape and photographs into evidence; and 5) admitting irrelevant phone records.

"In a habeas proceeding, [the] court may only intervene in a state judicial process to correct wrongs of constitutional dimension." Amos v. State of Minn, 849 F.2d 1070, 1073 (8th Cir. 1988.)  Only evidentiary errors that are so prejudicial as to deny due process or violate a specific constitutional right justify habeas relief.  Henderson v. Norris, 118 F.3d 1283, 1286 (8th Cir. 1997).  An error is so prejudicial as to deny due process if it fatally infects the entire trial, rendering the trial fundamentally unfair.  (Id.)  The court must review the totality of the facts in the case and analyze the fairness of the trial.  (Id.)

The trial court did not err in its evidentiary decisions in this case.  First, the court properly inquired into Teppen's competence to testify.  (T. 1340-48.)  See Andrews v. Neer, 253 F.3d 1052, 1062-63 (8th Cir. 2001) (F.R.E. 601 defines competence, status as involuntarily committed schizophrenic does not ipso facto render person incompetent to testify in federal court.)  Second, even if it was error under federal law to allow the prosecutor to cross-examine Petitioner on his possession of a gun in September 2003, the error did not fatally infect the trial. (T. 1818-26); see U.S. v. Wesley, 990 F.2d 360, 366 (8th Cir. 1993) (describing four-step analysis to determine if prior crimes are admissible).  It was made clear at trial that the gun used in the murder and attempted murder was a .44 caliber pistol, and the gun Petitioner possessed in September 2003 was a .22 caliber handgun.  (T. 1449, 1451, 1452, 1825.)  Therefore, the jury was not likely to have been improperly swayed by this testimony.  Furthermore, Petitioner had the opportunity to explain that he pled guilty to the misdemeanor possession charge even though the gun was not his because he was offered a plea bargain to serve only administrative probation. (Tr. 1826.)

On the third issue raised by Petitioner, Pate's conduct of leaving town without the

prosecution's knowledge and failing to appear for a meeting was not relevant to the credibility of

Pate's testimony.  (T. 1150-58.)  The court did not err in barring the defense from questioning

Pate about being held in jail until trial.  Fourth, a proper foundation was laid for admission of the

videotape and photographic evidence.  (T. 1378-90, 1670-73.)  Finally, the phone records were

relevant to the State's case because they tended to refute Petitioner's alibi of being with his

girlfriend, and showed that Petitioner's cell phone was used near the scene of the crime shortly

before the crime, thus establishing opportunity.  Therefore, Petitioner is not entitled to relief on

his challenge of the trial court's evidentiary rulings.

## III.    RECOMMENDATION

Based upon all of the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.    Petitioner's Application for a Writ of Habeas Corpus under 28 U.S.C. § 2254
       (Doc. No. 1) be **DENIED**;

2.    This action be **DISMISSED WITH PREJUDICE**.


Dated:  March 4, 2009

                                                        _s/ Arthur J. Boylan_____
                                                        ARTHUR J. BOYLAN
                                                        United States Magistrate Judge


Under District of Minnesota Local Rule 72.2(b), any party may object to this Report and

Recommendation by filing with the Clerk of Court, and serving all parties by March 18, 2009, a

writing which specifically identifies those portions of this Report to which objections are made

and the basis of those objections.  Failure to comply with this procedure may operate as a

forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may

respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.